UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────────

CONNIE CONRAD, AS TRUSTEE OF THE LACY H.
MCDEARMON REVOCABLE TRUST,

                                Plaintiff,              22-cv-10395 (PKC)

      -against-                                  OPINION AND ORDER

JOSEPH FISHER AND EYAL WALLENBERG,

                                Defendants.

─────────────────────────────────────────────

CASTEL, Senior Judge:

        Plaintiff Connie Conrad (the "Trustee"), as Trustee of the Lacy H. McDearmon Revocable Trust (the "Trust"), brings this action for conversion, unjust enrichment, and a declaratory judgment against Joseph Fisher and Eyal Wallenberg.  The Trustee alleges that Fisher and Wallenberg have converted an asset—namely, the proceeds of the sale of a co-op apartment (the "Proceeds")—purportedly owned by the Trust and that they have unjustly enriched themselves by doing so.  The Trustee also seeks declaratory judgment that the Proceeds "belong to the Trust" and that she "has the legal authority to receive the Apartment sale proceeds."  (ECF 15 ¶ 87.)

        Lacy H. McDearmon, Jr., the decedent and the settlor of the Trust, executed a 2013 will naming Fisher and Wallenberg as beneficiaries of a bequest of the co-op apartment. McDearmon executed two subsequent wills in 2015 and 2016 in which neither Fisher nor Wallenberg was named as a beneficiary.  Further, in 2018, during his lifetime, McDearmon transferred the co-op to the Trust.  After McDearmon's passing, Fisher and Wallenberg filed the

2013 will in New York Surrogate's Court and Conrad sought preliminary letters testamentary under the 2016 will.  Conrad, as Trustee, sought to sell the co-op, but Fisher and Wallenberg's position complicated a sale.  The parties entered into a written stipulation (the "Stipulation") bearing the caption of the New York Surrogate's Court that provided for the placement of the Proceeds in escrow pending "adjudication" of certain legal disputes pending in the Surrogate's Court.  (ECF 15-5 ¶ 13.)  These legal disputes are still ongoing in the Surrogate's Court.  (See In the Matter of Lacy McDearmon Jr., No. 2020-317 (N.Y. Surr. Ct filed 2020).)

Fisher and Wallenberg have moved to dismiss the Amended Complaint, arguing that this Court lacks subject matter jurisdiction over the Trustee's claims.  The Trustee invokes diversity jurisdiction, and there is no dispute that the Trustee and the Trust are New York citizens, that defendants are Illinois citizens, and that the amount in controversy exceeds the jurisdictional threshold.  With regard to subject matter jurisdiction, defendants urge that the Trustee lacks Article III standing to pursue claims related to the Proceeds.  Alternatively, they argue that if the Court finds that it does have subject matter jurisdiction, then under the Colorado River abstention doctrine, the Court should refrain from deciding the case.  They also urge that the Trustee's conversion and unjust enrichment claims should be dismissed for failure to state a claim.

For the reasons that follow, the Court concludes that it does have subject matter jurisdiction over this action, but that it will abstain from deciding the case pursuant to the Colorado River doctrine.

I.      BACKGROUND

For purposes of this motion to dismiss, the Court accepts the well-pleaded facts in the Amended Complaint ("Am. Compl.," ECF 15) as true and draws all reasonable inferences in favor of the Trustee as non-movant.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).

Lacy H. McDearmon, Jr. died in November 2019 at the age of eighty-seven. (ECF 15 ¶ 33.)  At the time of his death, McDearmon resided in a cooperative apartment located at 440 West End Avenue, #14A, New York, New York (the "Apartment").  (Id. ¶¶ 1, 31.)  Prior to his death, McDearmon's health declined, requiring him to receive hospice care, and he had required a live-in "daily caregiver" for years prior to that time.  (Id. ¶¶ 15-16, 31.)  The dispute between the parties arises from two different wills purportedly executed by McDearmon and an inter vivos trust purportedly created by him in 2016; each of the instruments provides for a different and inconsistent disposition of the Apartment, the Proceeds from the sale of which amount to over $2 million.  (Id. ¶¶ 13, 20, 23, 25, 30, 50.)

A.  The 2013 Will

In 2013, McDearmon executed a Last Will and Testament (the "2013 Will").  (Id. ¶ 13.)  In the 2013 Will, McDearmon bequeathed the Apartment to Fisher and Wallenberg.  (Id.) Fisher and Wallenberg are married, and, while not related to McDearmon, resided at the Apartment "part-time . . . as his friends."  (Id. ¶¶ 12-13.)  McDearmon also left legacies for other family members and friends, and "expressed a wish" that his sister be permitted to visit the Apartment after his death.  (Id. ¶ 13.)

After McDearmon executed the 2013 Will, Fisher and Wallenberg moved out of the Apartment and began living full-time in Brooklyn.  (Id. ¶ 14).  The Trustee alleges that Fisher and Wallenberg "removed the original copy of the 2013 Will from the Apartment without Mr. McDearmon's permission or knowledge."  (Id.)  In September 2014, Fisher and Wallenberg helped McDearmon find a caregiver that would reside with him, ultimately recommending Radu Brylynskei, who subsequently moved into the Apartment with McDearmon.  (Id. ¶¶ 15-16.)  Around "2014 or 2015," Fisher and Wallenberg moved to Chicago, Illinois, at which point, the Trustee alleges, they ceased "regular contact" with McDearmon.  (Id. ¶ 17.)

### B.  The 2015 Will

In March 2015, McDearmon executed a new will (the "2015 Will").  (Id. Ex. A (ECF 15-1).)[1]  It bequeathed all of McDearmon's real estate and personal property to his nephew, James P. Rainey, Jr., and while not explicitly mentioning the Apartment, these bequests necessarily included it.  (Id. at 3.)  McDearmon also bequeathed $25,000 to Brylynskei, who "presently resides with me in my apartment and who has assisted me greatly."  (Id.)  Fisher and Wallenberg were not named as beneficiaries in the 2015 Will, although several other friends who were named in the 2013 Will were given bequests in the 2015 Will as well.  (Id.; ECF 15 ¶¶ 18-19.)

### C.  The Lacy H. McDearmon Revocable Trust and the 2016 Pour-Over Will

In April 2016, McDearmon created "The Lacy H. McDearmon Revocable Trust."  (Id. ¶ 20; id. Ex. B (ECF 15-2).)  McDearmon named Yust and Conrad as the Trustees, and

---

[1] The Trustee attaches a copy of the 2015 Will to her Amended Complaint (Ex. A, ECF 15-1), as well as a copy of the 2016 Trust Agreement (Ex. B, ECF 15-2), but not a copy of the 2016 Will.  (See ECF 15.)

Conrad as the Successor Trustee.  (ECF 15 ¶ 21.)  The "sole lifetime income and principal beneficiary of the Trust" was McDearmon.  (ECF 15-2 at 6.)  Fisher and Wallenberg were not named as beneficiaries of the Trust.  (Id.; ECF 15 ¶ 22.)

On the same day, McDearmon also created a pour-over will (the "2016 Will").  (ECF 15 ¶ 25.)  Conrad was named the Executor of the 2016 Will.  (Id. ¶ 26.)   Fisher and Wallenberg were not named as beneficiaries in the 2016 Will.  (Id. ¶ 27.)  The 2016 Will "addressed all residual assets not placed in the Trust."  (Id. ¶ 25.)   Around the same time, McDearmon requested that TIAA Financial Services change the beneficiary designation on his retirement accounts from Fisher, whom he had previously named as beneficiary of the accounts, to the Trust.  (Id. ¶ 29.)

In 2018, "the Apartment was formally transferred to the Trust."  (Id. ¶ 30; id. Ex. C (ECF 15-3).)  The share certificate attached to the Amended Complaint names the Trust as the owner of 144 shares of 440 West End Apartments Corp.  (ECF 15-3.)

D.  McDearmon's Death and Subsequent Events

McDearmon's health began to decline in late 2019.  (Id. ¶ 31.)  He began receiving hospice care at the Apartment and died on November 30, 2019.  (Id. ¶¶ 31, 33.)

The Trustee alleges the following events around the time of McDearmon's death: three days before McDearmon died, Fisher called Yust from Chicago and asked Yust about McDearmon's estate; Fisher went to New York on December 2, two days after McDearmon's death, to obtain McDearmon's death certificate; and that, on December 26, "despite being no relation to Mr. McDearmon and not being an executor to Mr. McDearmon's estate, [] Fisher

contacted TIAA to inform TIAA that Mr. McDearmon had passed away" and submitted McDearmon's death certificate to TIAA.  (Id. ¶¶ 32-36.)[2]

 The Trustee also attaches to the Amended Complaint a letter dated February 19, 2020, sent by Fisher's attorneys to 440 West End Apartments Corp.  (Id. Ex. D (ECF 15-4).) This letter gave the board "formal notice . . . that, under no circumstances should the Board of Directors approve the transfer, sale or assignment of the Apartment."  (ECF 15 ¶ 41; ECF 15-4 at 3.)  The letter states that "Mr. Fisher was a close, longtime friend and caregiver of the Testator, and the Testator trusted Mr. Fisher, and treated him as a member of his family for many years." (ECF 15-4 at 2.)  The letter also explains that when Fisher and Wallenberg moved to Illinois, "a new caregiver was introduced to the Testator by his Executor, John Thomas Yust, Esq.  We understand that this individual, Mr. Radu Brylynskei, a part-time masseur, was hired as a paid caregiver.  We trust you are quite familiar with Mr. Brylynskei."  (Id.)  The letter also stated that McDearmon had been in "superior mind and health" when he devised the Apartment to Fisher and Wallenberg in the 2013 Will and noted that McDearmon's "physical and cognitive abilities in his final years were compromised by Alzheimer's disease," noting to the Board, "We trust that you were also familiar with his diminished abilities toward the end of his life."  (Id.)

 The Trustee also alleges that on the same date in February 2020, Fisher and Wallenberg, via their attorney, sent "threatening letters" to the Trustee, her attorney, Yust, and McDearmon's "prior attorney who drafted the 2013 Will."  (ECF 15 ¶ 44.)  These letters again

[2] The Trustee also alleges that Fisher and Wallenberg had previously removed documents about the TIAA accounts from McDearmon's home without McDearmon's knowledge or permission.  (Id. ¶ 37.)  She alleges that Fisher obtained custody of the funds in McDearmon's TIAA Accounts in January 2020, which were valued at approximately $1,000,000.  (Id. ¶ 38.)  She notes that "[t]he Estate of Mr. McDearmon is currently seeking recovery of Mr. McDearmon's TIAA Accounts from Defendants in a separate turnover proceeding in Surrogate's Court, New York County brought by Plaintiff, as the Executor of Mr. McDearmon's Estate . . . .")."  (Id. ¶ 39.)

6

requested McDearmon's "personal and financial documents" and "alleged 'undue influence, fraud and conversion of the Estate's assets.'"  (Id.)

E.  The Surrogate's Court Proceedings

On January 28, 2020, two months after McDearmon's death, Fisher filed a copy of the 2013 Will in the New York County Surrogate's Court.[3]  See N.Y. Sur. Ct., No. 2020-317 ("Will Filed Pending Probate").

On August 17, 2020, Fisher and Wallenberg filed, in Surrogate's Court, a Verified Petition pursuant to Surrogate's Court Procedure Act ("SCPA") sections 209 and 1401, seeking to compel production of the purported 2016 Will and the Lacy H. McDearmon Trust Agreement. On the same date, Fisher and Wallenberg also filed a Verified Petition, pursuant to SCPA sections 209 and 2102(1), seeking information about the "affairs and assets of the Estate" and "to temporarily restrain the sale or transfer of any asset of Decedent's Estate, or Decedent's Inter Vivos Trust."  (ECF 15-5 ¶¶ 1-2.)

On March 4, 2021, the Trustee, who was also named as Executor under the 2016 Pour-Over Will, filed a probate petition in Surrogate's Court seeking to admit the 2016 Will to probate.  (Id. ¶ 4.)  In May 2021, Fisher and Wallenberg filed correspondence with the Surrogate's Court objecting to the fact that they had not been served with notice of the probate petition.  (Id. ¶ 5.)  On June 18, 2021, Fisher and Wallenberg filed Verified Objections to Probate of the 2016 Will.  (Id. ¶ 6; ECF 15 ¶ 47.)

---

[3] The Court takes judicial notice of the fact that this filing was made in the New York County Surrogate's Court but not of the truth of any statements asserted within.  See Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (quoting International Star Class Yacht Racing Association v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir.1998)) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

F.  The Stipulation

Conrad, as Trustee, began the process of selling the Apartment after McDearmon's death.  (ECF 15 ¶ 40.)[4]  On approximately May 17, 2021, she secured a buyer.  (Id. ¶ 46.)  On approximately June 24, 2021, the parties' counsel discussed the sale of the Apartment by telephone; defendants, as noted above, had filed their Verified Objections to the probate of the 2016 Will a few days earlier.  (Id. ¶¶ 47-48.)  During this phone call, Fisher and Wallenberg's counsel, Owen Kloter, "confirmed their intention to stop the sale of the Apartment if the proceeds of the sale were to be distributed according to the terms of the Trust."  (Id. ¶ 48.)  The Trustee alleges that, "[i]n order to allow the sale of the Apartment to proceed, and to prevent the problems that would result from delaying the sale," she was "forced to agree to enter into a stipulation with Defendants."  (Id. ¶ 49.)

The Stipulation was entered into by the parties on July 19, 2021.  (Id.; ECF 15-5.)  The caption of the Stipulation sets forth the name of the court (Surrogate's Court of the State of New York, County of New York), lists file number 2020-317, and the title of the proceeding, "In the Matter of the Probate Proceeding, Will of Lacy Harrison McDearmon, Jr." (ECF 15-5 at 2.)

The Stipulation recites that the parties "have agreed to permit the sale of the [Apartment] to proceed while they resolve the foregoing disputes, including entitlement to the sale proceeds, in Court."  (Id. ¶ 9.)  The "foregoing disputes" are enumerated in paragraphs 1 through 7 of the Stipulation.  Paragraphs 1 and 2 refer to defendants' "Verified Petition pursuant to SCPA 209 and 140 [sic] in the above-captioned matter, seeking an Order to compel production of [McDearmon's] purported 2016 Last Will and Testament and Trust" and defendants' "Verified Petition pursuant to SCPA 209 and 2102(1) seeking an Order to direct

---

[4] Yust resigned as Trustee of the Trust in October 2020, making Conrad the sole Trustee thereafter.  (Id. ¶ 45.)

Decedent's Estate's executor to supply information regarding the assets and affairs of Decedent's Estate, and to temporarily restrain the sale or transfer of any assets of Decedent's Estate, or Decedent's Inter Vivos Trust ('Trust')."  (Id. ¶¶ 1-2.)

The Stipulation also refers to Conrad's Probate Petition, filed as Executor on March 4, 2021, "seeking, inter alia, admission to probate of a purported 2016 Will of Decedent." (Id. ¶ 4).  The Stipulation states that Fisher and Wallenberg had filed "correspondence objecting to the fact that they had not been served with notice of Conrad's Petition and that the Court had not obtained jurisdiction," and that they had also "filed Objections on various grounds to Conrad's Petition for Probate."  (Id. ¶¶ 5-6.)  The Stipulation notes that these petitions had not been adjudicated "as of the date of this stipulation" (July 2021).  (Id. ¶¶ 3, 7.)

The Stipulation provides that the net proceeds of the sale of the Apartment would be held in an attorney escrow account.  (Id. ¶ 10.)  The escrow account was held by the Trust's real estate attorney, Richard E. Tesler.  (Id.)  The Stipulation further provides that the Proceeds would remain in Tesler's escrow account until December 29, 2022; then, if "the foregoing disputed matters are still pending" as of that date, the proceeds would be divided in half: 50% would be distributed to the attorney escrow account for Conrad's attorney, and the other 50% would be distributed to the attorney escrow account for defendants' attorney.  (Id. ¶¶ 11-12)

Paragraph 9 of the Stipulation reads, "The Parties have agreed to permit the sale of the Co-Op to proceed while they resolve the foregoing disputes, including entitlement to the sale proceeds, in Court."  (Id. ¶ 9.)  Paragraph 13 reads:  "Without regard to the account or accounts in which the Net Proceeds are deposited, the Net Proceeds may only be released by consent of all Parties' attorneys, and, unless otherwise agreed by the Parties' attorneys, if there is an adjudication of the disputed matters relating to the Decedent, Decedent's Wills, Decedent's

Trust, and the Co-Op before the Surrogate's Court of the State of New York, New York County, pending in File No. 2020-317 before that Court."  (Id. ¶ 13.)

On the Apartment sale closed on August 30, 2021; the net proceeds from the sale in the amount of $2,114,299.02 were deposited on the same day into Tesler's escrow account (the "Escrow Account").  (ECF 15 ¶ 50.)

On July 5, 2022, the Surrogate's Court issued preliminary letters testamentary to Conrad, as Executor.  (Id. ¶ 51.)  As of December 2022, Conrad asserts that all of the beneficiaries of McDearmon's 2013 Will and the 2016 Will had filed waivers with the Surrogate's Court consenting to admit the 2016 Will to probate, with the exception of Fisher and Wallenberg.  (Id.)

On December 2, 2022, Conrad wrote to defendants demanding the release of all monies in the Escrow Account to the Trust.  (Id. ¶ 52.)  Later that day, Fisher and Wallenberg's attorney responded, rejecting this demand and "threatening sanctions if Plaintiff commenced any legal action to recover the monies held in the Escrow Account."  (Id.)  To date, the Proceeds still remain in the escrow accounts.  (Id. ¶ 53.)


II.    PROCEDURAL HISTORY

Conrad, as Trustee, brought this lawsuit on December 8, 2022 for conversion and unjust enrichment.  (ECF 1.)  She filed an amended complaint in March 2023, adding a claim for a declaratory judgment that "Plaintiff is the bona fide Trustee of the Trust, that the Apartment sale proceeds belong to the Trust, and that Plaintiff has the legal authority to receive the Apartment sale proceeds."  (ECF 15 at 13 ¶ A.)

Fisher and Wallenberg moved to dismiss both the original Complaint (ECF 13) and the Amended Complaint (ECF 20).  They argue that the Amended Complaint should be dismissed pursuant to Rule 12(b)(1), Fed. R. Civ. P., for lack of subject matter jurisdiction and Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim.  (ECF 21 at 1.)

For claims pursuant to Rule 12(b)(1), Fed. R. Civ. P., courts "constru[e] the complaint liberally and accept[] all factual allegations in the complaint as true."  Ford v. D.C. 37 Union Local 1549, 579 F.3d 187, 188 (2d Cir. 2009) (citing Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006)).  "Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper 'when the district court lacks the statutory or constitutional power to adjudicate it.'"  Id. (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)).

As will be explained below, the Court concludes that the Trustee does have standing to bring this claim.  However, the Court will abstain from deciding this action pursuant to the Colorado River doctrine.

III.   DISCUSSION

A.   The Trustee Has Article III Standing and
The Court Has Subject Matter Jurisdiction

Fisher and Wallenberg argue that this Court lacks subject matter jurisdiction over this case because the Trustee lacks standing to pursue her claims under Article III of the Constitution.  (ECF 21 at 10-13.)  The "'irreducible constitutional minimum' of standing consists of three elements"—that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

11

judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

　　　　　To establish an "injury in fact," "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 339 (quoting Lujan, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Id. (quoting Lujan, 504 U.S. at 560 n.1). "A 'concrete' injury must be 'de facto'; that is, it must actually exist." Id. (citing Black's Law Dictionary 479 (9th ed. 2009)). "As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 430–31 (2021) (citing Lujan, 504 U.S. at 561).

　　　　　Although none of the parties address standing for each individual claim, the Trustee must demonstrate standing for each of the claims she brings—declaratory judgment, conversion, and unjust enrichment. See Town of Chester, New York v. Laroe Estates., Inc., 581 U.S. 433, 439 (2017) (citations and internal quotation marks omitted) ("Our standing decisions make clear that standing is not dispensed in gross. To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."). Despite these deficiencies in the structure of the parties' submissions, the Court must assure itself of its subject matter jurisdiction. See Pashaian v. Eccelston Properties, Ltd., 88 F.3d 77, 82 (2d Cir. 1996) (citing Thompson v. County of Franklin, 15 F.3d 245, 248 (2d Cir.1994)) (explaining that "because [standing] is jurisdictional, we must examine the issue sua sponte when it emerges from the record"). "Supreme Court caselaw makes clear that district courts have broad discretion when determining how to consider challenges to subject matter jurisdiction." Harty v. West Point Realty, Inc., 28 F.4th 435, 441 (2d Cir. 2022) (citing Gibbs v. Buck, 307 U.S. 66, 71–72

(1939) (collecting cases).[5]  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record."  Steinberger v. Lefkowitz, 634 F. App'x 10, 11 (2d Cir. 2015) (summary order) (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990) (citations and quotation marks omitted)).

Defendants principally argue that the Trustee cannot establish two of the elements necessary for standing: that the Trustee has suffered a concrete injury in fact, nor that any injury the Trustee has suffered is "fairly traceable to the challenged conduct of the defendant."[6]  The Trustee responds only insofar as she addresses her standing to bring her declaratory judgment claim, and does not address her standing for the conversion or unjust enrichment claims.  (ECF 22 at 10-12.)

Normally, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish Article III standing, "for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  Lujan, 504 U.S. at 561.  This standard changes, however, for a factual Rule 12(b)(1) challenge as to subject matter jurisdiction.  "A Rule 12(b)(1) motion challenging subject

---

[5] See also Alliance For Environmental Renewal, Inc. v. Pyramid Crossgates Company, 436 F.3d 82, 87–88 (2d Cir. 2006) (citing Gibbs, 307 U.S. at 71–72) (footnotes omitted) ("As in any case requiring determination of Article III standing, once the Defendants' motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) put the Plaintiffs' Article III standing in issue, the District Court has leeway as to the procedure it wishes to follow.").

[6] Defendants also claim, in their reply brief, that the Trustee has conceded the "fairly traceable" element of standing because she has not addressed it in her opposition brief.  (ECF 24 at 3.)  But the Trustee does address this argument, albeit in a single sentence, in her brief.  (See ECF 22 at 12 ("For the same reasons, Defendants' related argument that the Trust's injury is not 'fairly traceable to the challenged conduct of the defendant' because both parties voluntarily entered into the Escrow Stipulation, is similarly defective and also fails.")).  These "same reasons" are the arguments the Trustee lays out in the preceding sentences:  that the Escrow Stipulation does not confer legal title to the Apartment to defendants, merely providing that the proceeds be set aside while that issue is resolved.  (Id. at 11.)

matter jurisdiction may be either facial or fact-based." <u>Carter v. HealthPort Technologies, LLC</u>, 822 F.3d 47, 56 (2d Cir. 2016). Facial challenges rely only on the allegations of the complaint and the exhibits attached to it; in a factual challenge, however, defendants may proffer evidence beyond the pleading to controvert the plaintiff's claims of standing. <u>Id.</u> at 56-57.

"In opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." <u>Id.</u> at 57 (quoting <u>Exchange National Bank of Chicago v. Touche Ross & Company</u>, 544 F.2d 1126, 1131 (2d Cir. 1976)). "However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." <u>Id.</u>

"If the extrinsic evidence presented by the defendant is material and controverted," however, "the district court will need to make findings of act in aid of its decision as to standing."[7] <u>Id.</u> While district courts have wide latitude in deciding questions of jurisdiction, in the case "[w]here a party offers extrinsic evidence that contradicts the material allegations of the complaint," the Second Circuit has "suggested that it would be error for the district court to disregard that extrinsic evidence. This limit tracks our abuse of discretion standard, which states that a district court abuses its discretion when 'its conclusions are based . . . on a clearly erroneous assessment of the evidence.'" <u>Harty</u>, 28 F.4th at 442 (quoting <u>Crescent Publishing Group, Inc. v. Playboy Enterprises, Inc.</u>, 246 F.3d 142, 146 (2d Cir. 2001)) (citations omitted).

---

[7] The Second Circuit has noted that, on appeal, "if the court . . . resolved disputed facts, we will accept the court's findings unless they are 'clearly erroneous.'" <u>Rent Stabilization Association of New York v. Dinkins</u>, 5 F.3d 591, 594 (2d Cir. 1993).

Fisher and Wallenberg have submitted evidence in support of their Rule 12(b)(1) challenge to the Trustee's standing.   In support of this motion, Fisher and Wallenberg's attorney submitted a declaration annexing 21 exhibits, in which he outlines the factual background of the parties' Surrogate's Court proceedings and the process by which the parties came to agree upon the execution of the Stipulation, including emails among him, the Trustee's attorneys, and Tesler.  (See ECF 20-1 ("Kloter Declaration") ¶¶ 8-28; id. Exs. F-S.)

Defendants argue, in substance, that the Trustee has not suffered an Injury in fact, nor that any injury the Trustee has suffered is "fairly traceable" to their conduct.[8] The Court concludes, however, that the Trustee has sufficiently alleged an injury in fact that is fairly traceable to the defendants' conduct, and that the Trustee has also sufficiently alleged the redressability of the relief she requests.

For each of her claims—declaratory judgment, conversion, and unjust enrichment—the Trustee describes her injury as the defendants' purported exercise of threats to "disrupt the sale of the apartment," forcing her to enter into the Stipulation and to place the funds in escrow, and alleges that defendants' continued refusal to release their "half" of the proceeds from their escrow account, as a deprivation of the Trust's property, is a sufficient injury.

The Court finds that the Trustee has indeed sufficiently alleged that this is an injury.  This district has found that a failure to return escrowed funds for which plaintiff has

_____

[8] Defendants also claim, in their reply brief, that the Trustee has conceded the "fairly traceable" element of standing because she has not addressed it in her opposition brief.  (ECF 24 at 3.)  But the Trustee does address this argument, albeit in a single sentence, in her opposition brief.  (See ECF 22 at 12 ("For the same reasons, Defendants' related argument that the Trust's injury is not 'fairly traceable to the challenged conduct of the defendant' because both parties voluntarily entered into the Escrow Stipulation, is similarly defective and also fails.")).  These "same reasons" are the arguments the Trustee lays out in the preceding sentences:  that the Escrow Stipulation does not confer legal title to the Apartment to defendants, merely providing that the proceeds be set aside while that issue is resolved.  (Id. at 11.)

made a demand is a sufficient injury to establish standing for a declaratory judgment claim.  See
Ray Legal Consulting Group v. Gray, 37 F. Supp. 3d 689, 698–99 (S.D.N.Y. 2014) (Failla, J.)
("Plaintiff has made a claim for fees due to it for legal services provided to Caldwell, thereby
demonstrating its stake in the outcome of this controversy.  The injury in fact is the current
deprivation of funds to which Plaintiff alleges it is entitled that is caused by Defendants' claim to
those funds; Plaintiff's injury will be redressed by a determination of whether Defendants do in
fact have a claim to the disputed funds.").

   The Court also concludes that the Trustee has alleged that her injury is "fairly
traceable" to defendants' challenged conduct.  It is fairly traceable to Fisher and Wallenberg's
conduct in asserting their competing claim to the Proceeds of the Apartment sale.  See Harry v.
Total Gas & Power North America, Inc., 889 F.3d 104, 110 (2d Cir. 2018).  By asserting their
competing claim to the Proceeds, defendants caused those Proceeds to be placed in escrow.  Ray
Legal, 37 F. Supp. 3d at 698–99.  And a declaratory judgment that the Trust is the valid owner of
those Proceeds would redress the Trustee's injury.  Id.

   Again, given that the pleading standard to establish Article III standing is lower
than that to state a claim, the Court concludes that the Trustee has adequately pleaded standing
here.  The Court therefore has subject matter jurisdiction over the Trustee's claims.


  B.  The Court Will Abstain Under Colorado River

   Pending in New York Surrogate's Court are issues that are dispositive of the
claims in this action, including but not limited to the validity of the 2013 Will and the 2016 Will.
If the 2016 Will is valid, then it necessarily revokes the prior 2013 Will depriving Fisher and
Wallenberg of any viable claim to the Proceeds.  The Court concludes that, while it has subject

16

matter jurisdiction, this is the rare case where prudential considerations counsel in favor of the Court abstaining from hearing the merits of the claims.

Abstention is a doctrine that provides "a few extraordinary and narrow exceptions to a federal court's duty to exercise its jurisdiction," and is "generally disfavored," since "federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction." Niagara Mohawk Power Corporation v. Hudson River-Black River Regulating District, 673 F.3d 84, 100 (2d Cir. 2012) (citations omitted).

The Trustee asserts claims in this action that are declaratory and also claims for money damages, i.e., conversion and unjust enrichment. (ECF 15 ¶¶ 54-88.) Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), sets forth the factors governing abstention where, as here, the claims are not "purely declaratory." See Kanciper v. Suffolk County Society for the Prevention of Cruelty to Animals, Inc., 722 F.3d 88, 93 (2d Cir. 2013) (quoting Niagara, 673 F.3d 84 at 106) ("We have stated before, and we now hold, that 'Wilton does not apply where, as here, a plaintiff does not seek purely declaratory relief, but also . . . seeks damages caused by the defendant's conduct.")).[9] See also Niagara, 673 F.3d at 106 n.7 (citations omitted) ("In any event, we note that [plaintiff] seeks not only a declaratory judgment but also, inter alia, a damages award of $5 million and 'such other relief as the [district court] deems appropriate,' including fees and costs.  These demands for non-declaratory relief also counsel against Wilton abstention."); InteliClear, LLC v. Victor, 2017 WL 2225212, at *2 (D. Conn. May 18, 2017) (citing Kanciper, 722 F.3d at 93) (noting that, "[i]n an action seeking declaratory relief and monetary damages, as here, the Second Circuit directs that a court should

---

[9] Wilton v. Seven Falls Company, 515 U.S. 277 (1995), applies where the claims, unlike this action, are purely declaratory.

apply the Colorado River abstention doctrine," and holding that grounding the argument only on Wilton failed).

      1.   The Cases are Parallel

A threshold question, before reaching the analysis of the Colorado River factors, is whether there is a "parallel" ongoing state case. Dittmer v. County of Suffolk, 146 F.3d 113, 118 (2d Cir. 1998) ("[A] finding that the concurrent proceedings are 'parallel' is a necessary prerequisite to abstention under Colorado River."). The Court concludes that the Surrogate's Court proceedings are parallel to this action.

The Trustee asserts that there is "no concurrent Surrogate's Court litigation with respect to the Trust." (ECF 22 at 13.) The Trustee's argument is based on the fact that the defendants did not file their challenge to the Trust in Surrogate's Court until April 2023. (Id.) But courts in this Circuit have concluded that cases are parallel where "there is a substantial likelihood that the Surrogate's Court proceedings will effectively dispose of Plaintiff's claims in this case," and where, "crucially, the gravamen of this case . . . is also at issue in Surrogate's Court." Clemente v. Clemente as Trustee of Clemente Qualified Personal Residence Trust I [Troy, New York], 2023 WL 2139809, at *4 (N.D.N.Y. Feb. 21, 2023) (footnote omitted); Abe v. New York University, 2016 WL 1275661, at *6 (S.D.N.Y. Mar. 30, 2016) (Sullivan, J.) ("Furthermore, there is also a substantial likelihood that the State Action will dispose of Plaintiff's four claims . . . in the Federal Action," supporting a finding of parallel cases).

The Surrogate's Court proceedings will determine the validity of the 2013 Will and the 2016 Will. If the 2016 Will is valid, then the bequest of the Apartment to Fisher and Wallenberg is necessarily revoked. See N.Y. Estates, Powers & Trusts Law ("EPTL") § 3-

4.1(a)(1)(A).  If the bequest to Fisher and Wallenberg is revoked, they have no cognizable claim

to the Apartment or the Proceeds therefrom.  Indeed, Fisher and Wallenberg's claims would be

extinguished if the 2015 Will (with a specific bequest of the Apartment to the decedent's

nephew) is valid, even if the 2016 Will is not.  Issues relating to the Trust are much of a red

herring in the action before this Court, because if the 2013 Will has been revoked by reason of a

subsequent will, Fisher and Wallenberg have no lawful claim to the Proceeds, which is very

much the subject of this action.

                    The "underlying events" of both actions are also identical, further demonstrating

that the cases are parallel.  See Phillips v. Citibank, N.A., 252 F. Supp. 3d 289, 296 (S.D.N.Y.

2017) (Batts, J.) (citing Telesco v. Telesco Fuel and Masons' Materials, Inc., 765 F.2d 356, 362

(2d Cir. 1985)) ("Nevertheless, the fact that Plaintiffs seek different, and even conflicting, forms

of recovery in this action does not defeat parallelism, where the underlying events remain

identical.").  See also Abe, 2016 WL 1275661, at *6 (quoting National Union Fire Insurance

Company of Pittsburgh, Pennsylvania v. Karp, 108 F.3d 17, 22 (2d Cir. 1997)) ("Federal and

state proceedings are 'parallel' for abstention purposes 'when the two proceedings are essentially

the same; that is, there is an identity of parties, and the issues and relief sought are the same.'").

                    Having concluded that the cases are in fact parallel, the Court proceeds to analyze

the Colorado River factors.  For the reasons below, the Court finds that the balance of these

factors counsel in favor of abstention.


                    2.   Application of the Colorado River Factors

                    "In evaluating whether Colorado River abstention is appropriate, federal district

courts are to consider six factors, 'with the balance heavily weighted in favor of the exercise of

jurisdiction': (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights." Niagara, 673 F.3d at 100–01 (first quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corporation, 460 U.S. 1, 16 (1983), then quoting Woodford v. Community Action Agency of Greene County, Inc., 239 F.3d 517, 522 (2d Cir. 2001)).

The Court proceeds to analyze each factor.

      a.  Whether the controversy involves a res over which one of the courts has assumed jurisdiction

Although the analysis under this factor often addresses whether one court has "assumed jurisdiction" over a res by analyzing the specific steps the court has taken in relation to it, courts in this Circuit have also held that even when claims "do not independently implicate a res" but "remain inextricably linked with the issues of trust administration pending before the Surrogate's Court," or where such claims "are only requested as an alternative to relief affecting property under the Surrogate's Court's jurisdiction," such circumstances weigh in favor of abstention. Phillips, 252 F. Supp. 3d at 299 (footnote omitted). Other courts have found that this factor weighs in favor of abstention even when a revocable trust is "not directly at issue" in a Surrogate's Court proceeding, but where the "administration of [an] estate would almost certainly affect the assets in the trust." Clemente, 2023 WL 2139809, at *4.

The Stipulation entered into by the parties weighs in favor of this Court abstaining in favor of the Surrogate's Court.  "A stipulation is an independent contract which is subject to the principles of contract law."  Adelsberg v. Amron, 103 A.D.3d 571, 572 (1st Dep't 2013) (citing Matter of Caruso v. Ward, 146 A.D.2d 22 (1st Dep't 1989)).  "A written agreement should be read as a whole to give effect to its general purpose, and a court generally should not construe contractual language 'in such a way as would distort the contract's apparent meaning.'"  Fort v. Haar, 209 A.D.3d 466, 467 (1st Dep't 2022) (citations omitted).

As noted, the caption on the Stipulation signed by the parties reads, "Surrogate's Court of the State of New York, County of New York; In the Matter of the Probate Proceeding, Will of Lacy Harrison McDearmon, Jr.," with the file number 2020-317.  As defendants correctly point out, it was not filed with the Surrogate's Court.  (ECF 21 at 14.)  The petitions and proceedings referred to throughout the Stipulation were all filed in Surrogate's Court (defendants' SCPA §§ 209 and 1401 petition, their §§ SCPA 209 and 2102(1) petition, the Trustee's probate petition, defendants' correspondence about not being served with notice of the probate petition, and defendants' objections to the probate petition).  (ECF 15-5 ¶¶ 1-2, 4, 5-6.)

Analyzing the entirety of the Stipulation as a whole, including paragraphs 3, 5, 7 and 9, the Court construes the term "Court" throughout the Stipulation to mean "the Surrogate's Court of the State of New York, New York County, pending in File No. 2020-317 before that Court."  (Id. ¶ 13.).

In ruling on defendants' Objections to the Trustee's probate petition, the Surrogate's Court will likely rule on whether the decedent had testamentary capacity sufficient to defeat any allegations of undue influence or fraud when he executed either the 2015 or 2016 Wills.  If the decedent had testamentary capacity and the 2015 or 2016 Wills are otherwise valid,

then defendants would be conclusively disinherited because either of the subsequent wills would have revoked the 2013 Will of which defendants were beneficiaries.  See N.Y. EPTL § 3-4.1(a)(1)(A).  They would therefore have no entitlement to the Proceeds.  If the 2013 Will is valid and the 2015 and 2016 Wills invalid, then the Surrogate's Court would then and only then need to determine the validity of the Trust and the effect of the 2018 inter vivos transfer of the Apartment to the Trust.  If this Court, therefore, attempted now to rule on the Trust's validity and the Trustee's right to the Proceeds, it would create a risk of inconsistent rulings in derogation of the jurisdiction of the Surrogate's Court.  This first factor, then, weighs heavily in favor of this Court's abstention.


    b. Whether the federal forum is less inconvenient than the other for the parties

    This factor is neutral—the New York County Surrogate's Court is located only a few blocks away from the federal courthouse at 500 Pearl Street.  Although "there is plainly inconvenience in having to litigate actively in both state and federal courts at the same time," Phillips, 252 F. Supp. 3d at 299 (quoting Lefkowitz v. Bank of New York, 676 F. Supp. 2d 229, 275 (S.D.N.Y. 2009) (Marrero, J.)), as defendants argue when they assert the Trustee is forcing them to fight a "two-front war of attrition" by bringing this federal action (ECF 21 at 16), the Second Circuit has held that such an argument "would eviscerate Colorado River, as federal courts consider abstaining under Colorado River only in cases where there are concurrent and simultaneous federal and state proceedings." Village of Westfield v. Welch's, 170 F.3d 116, 122 (2d Cir. 1999).  The mere fact that there are concurrent, parallel cases does not weigh in favor of abstention, and there is no geographical inconvenience in litigating in federal court.  This factor therefore does not favor this Court's abstention.  See Niagara, 673 F.3d at 101 (citation omitted)

("Where a <u>Colorado River</u> factor is facially neutral, that 'is a basis for retaining jurisdiction, not for yielding it.'").

   c. Whether staying or dismissing the federal action will
     avoid piecemeal litigation

 The Second Circuit has held that the "danger of piecemeal litigation is the paramount consideration" under a <u>Colorado River</u> analysis.  <u>See</u> <u>Arkwright–Boston Manufacturers Mutual Insurance Company v. City of New York</u>, 762 F.2d 205, 211 (2d Cir. 1985); <u>Phillips</u>, 252 F. Supp. 3d at 299 (quoting <u>Arkwright–Boston</u>, 762 F.2d at 211).  "This factor favors abstention even where the actions are 'merely duplicative,' such that the availability of res judicata or collateral estoppel would mitigate the risk of inconsistent outcomes."  <u>Phillips</u>, 252 F. Supp. 3d at 299 (quoting <u>Tarka v. Greenfield Stein & Senior, LLP</u>, 2000 WL 1121557, at *5 (S.D.N.Y. Aug. 8, 2000) (Scheindlin, J.)).  <u>See</u> <u>also</u> <u>Telesco</u>, 765 F.2d at 362 ("[W]e hold that on balance there were sufficient grounds for the dismissal of the existing federal action.  To begin with, the federal and state actions are essentially the same. . . .Thus, the federal action does in fact duplicate the state litigation. . . .").

   This factor weighs in favor of abstention where "the resolution of the Surrogate's Court action will either preclude recovery completely or collaterally estop the relitigation of substantive issues in this action, thus alleviating the risk of duplicative effort and varied results." <u>Phillips</u>, 252 F. Supp. 3d at 300.  The validity of the Trust is both before this Court and the Surrogate's Court, but only the Surrogate's Court can determine whether the 2015 or 2016 Wills revoked the 2013 Will.  It is more efficacious for one Court—the only Court that has all of these issues before it—to decide these issues in the sequence that it deems appropriate, reaching only those issues necessary to an efficient resolution of the matters before it.

The resolution of the proceedings in Surrogate's Court will avoid the risk of piecemeal litigation and inconsistent outcomes.

> ### d. The order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other

The Supreme Court has noted that the temporal "'priority' element" of the Colorado River test should not be given "too mechanical a reading," explaining that "[t]his factor, as with the other Colorado River factors, is to be applied in a pragmatic, flexible manner with a view to the realities of the case at hand. Thus, priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." Moses H. Cone, 460 U.S. at 21.

Defendants originally filed the 2013 Will with the Surrogate's Court in January 2020, then filed their first petitions in Surrogate's Court in August 2020. Conrad, in turn, filed for letters testamentary in May 2021 and was issued preliminary letters testamentary in July 2022. At this point, the action in this Court had not yet been filed.

On December 8, 2022, the Trustee filed this action. Then, in April 2023, defendants filed a direct attack on the Trust in Surrogate's Court.

The import of defendants' effort in Surrogate's Court to probate the 2013 Will and void any subsequent will is directed to the Apartment or the Proceeds of the sale of the Apartment. That effort began in Surrogate's Court before the action in this Court was commenced. Defendants have mounted a multipronged effort to obtain the Proceeds, of which the April 2023 challenge to the Trust in Surrogate's Court is only one part.

Case 1:22-cv-10395-PKC   Document 25   Filed 03/26/24   Page 25 of 28

Neither the Surrogate's Court action nor this action has proceeded very far. Preliminary letters testamentary were issued to Conrad in her capacity as executor of the estate. In this Court, the Complaint and an Amended Complaint were filed, and this Court set a briefing schedule on the instant motions.

e. Whether federal law provides the rule of decision

This factor also weighs in favor of abstention. The Trustee's conversion and unjust enrichment claims are state law claims. And the underlying questions of ownership of the proceeds, the validity of the Trust, and the will contest in the Surrogate's Court are all also questions of New York law, not federal law. Finally, the Declaratory Judgment Act only provides federal district courts with the discretion to decide underlying substantive rights, which, as noted, are state law conversion and unjust enrichment claims. See Architectural Body Research Foundation v. Reversible Destiny Foundation, 335 F. Supp. 3d 621, 634 (S.D.N.Y. 2018) (Nathan, J.) (first quoting Warner-Jenkinson Company v. Allied Chemical Corporation, 567 F.2d 184, 186 (2d Cir. 1977), then quoting Tasini v. New York Times Company, 184 F.Supp.2d 350, 358 n.12 (S.D.N.Y. 2002) (Carter, J.)) ("The Declaratory Judgment Act 'does not independently create federal jurisdiction,' and thus 'is insufficient to confer federal jurisdiction . . . in the absence of a controversy involving a federal question.'").

Therefore, federal law does not provide the rule of decision in this case—New York state law does. This factor weighs heavily in favor of a federal court abstaining.

f.  Whether the state procedures are adequate to protect the plaintiff's federal rights

Finally, the analysis of this sixth factor is similar to the analysis under the fifth: here, only state law claims are implicated.  In terms of specific state procedures, the Trustee asserts that Fisher and Wallenberg do not want a federal court to decide their claims because they seek to use the more "favorable" discovery procedures available to them in the Surrogate's Court (i.e., SCPA § 1404, which "allows potential challenges to a propounded will to test the instrument's validity before deciding whether to proceed with litigation").  (ECF 22 at 1; id. n.2.) She also accuses the defendants of using the Surrogate's Court's "extensive backlog," which has resulted in a delay in those proceedings, to "frustrate Plaintiff's access to, and distribution of, the Apartment sale proceeds, and thereby force a settlement."  (Id. at 2.)  Finally, the Trustee also accuses the defendants of "a cynical attempt at forum shopping" by moving to dismiss this federal action in hopes of accessing these "more favorable" Surrogate's Court discovery procedures.  (Id. at 1.)

While the backlog in the Surrogate's Court, undoubtedly impacted by the recent pandemic, is unfortunate, it is not a reason to deny defendants access to the discovery procedures and the forum they selected to litigate these issues as early as August 2020.  (ECF 20-3, 20-4.) The Trustee concedes that the Surrogate's Court discovery procedures are more favorable for defendants than federal discovery procedures. The Trustee's claim that the defendants are forum shopping is undermined by the incontrovertible circumstance that she filed this federal court action nearly two and a half years after the first filing by defendants is Surrogate's Court.  This factor therefore also weighs in favor of abstention.

g.    Consideration of all factors taken as a whole warrants a stay

Analyzing each of the <u>Colorado River</u> factors both separately and in tandem "with a view to the realities of the case at hand," the Court concludes that abstention is proper in this case. <u>Moses H. Cone</u>, 460 U.S. at 21. The questions of state law, the Surrogate's Court's ability to protect the parties' rights, and the risk of piecemeal litigation with inconsistent outcomes, all weigh in favor of this Court abstaining in favor of the Surrogate's Court proceedings.

A district court may exercise its discretion to either stay or dismiss a case once it has concluded that it will abstain under <u>Colorado River</u>. <u>See id.</u> at 28 (footnote omitted) ("We have no occasion in this case to decide whether a dismissal or a stay should ordinarily be the preferred course of action when a district court properly finds that <u>Colorado River</u> counsels in favor of deferring to a parallel state-court suit. We can say, however, that a stay is as much a refusal to exercise federal jurisdiction as a dismissal."). For cases that decided under the <u>Colorado River</u> standard, the Second Circuit has affirmed both dismissals and stays of the federal action. <u>See</u>, <u>e.g.</u>, <u>Arkwright-Boston</u>, 762 F.2d at 208 (affirming dismissal under <u>Colorado River</u>); <u>Telesco</u>, 765 F.2d at 364-65 (same); <u>General Star International Indemnity, Ltd. v. Chase Manhattan Bank</u>, 57 F. App'x 892, 893 (2d Cir. 2003) (summary order) (affirming stay pending resolution of parallel state court action under <u>Colorado River</u>).

In the context of <u>Wilton</u> abstention for a declaratory judgment action, the Second Circuit has explained that "where the basis for declining to proceed is the pendency of a state proceeding, a stay will often be the preferable course, because it assures that the federal action can proceed without risk of a time bar if the state case . . . fails to resolve the matter in controversy." <u>Niagara</u>, 673 F.3d at 105 (quoting <u>Wilton</u>, 515 U.S. at 288 n.2). But for cases decided under <u>Colorado River</u>, the Second Circuit has also explained that, in some cases, "the

27

court should reconsider whether to dismiss the federal action (and toll the statute of limitations) rather than stay it.  There is no difference between a stay and a dismissal for purposes of the Colorado River doctrine.  But affording the parties the benefit of the original filing date for a new action may lead to controversy as to the scope and operation of the order," including the possibility "that the tolling of statutes of limitations may allow altogether new claims to be asserted any time in the future."  Burnett v. Physician's Online, Inc., 99 F.3d 72, 77-78 (2d Cir. 1996) (citations omitted).

In the exercise of its discretion, the Court concludes that staying this action until the Surrogate's Court acts is the proper remedy.  The Court reserves the right to revisit the proper remedy—dismissal or stay—any time after June 2025.

IV.    CONCLUSION

Defendants' motion is GRANTED to the extent that the Court will stay the action pending resolution of matters in Surrogate's Court.  The Court reserves the right to revisit whether dismissal or stay is the proper remedy at any time after June 30, 2025.  The Clerk is respectfully directed to terminate the motions (ECF 13, 20).

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated:        New York, New York
              March 26, 2024

28